# In the United States Court of Federal Claims

No. 23-125
Filed: January 19, 2024

|   |
|---|
| **RANCHO VISTA DEL MAR, et al.,** *Plaintiffs*, v. **THE UNITED STATES,** *Defendant*. |

*Roger J. Marzulla*, with *Nancie G. Marzulla*, Marzulla Law, LLC, Washington, D.C., for Plaintiffs.

*Brigman L. Harman*, with *Kimberly A. Cullen,* Trial Attorneys, *Todd Kim*, Assistant Attorney General, Environment & Natural Resources Division, Natural Resources Section, U.S. Department of Justice, Washington, D.C., for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

Good fences make good neighbors.[1] Bad fences—or as here, an incomplete fence—prompt squabbles. This dispute began after Plaintiffs (collectively "Rancho Vista"), who own properties adjacent to the border with Mexico in San Diego County, California, entered into a lease and access agreement with the United States. The United States used the access to continue constructing the border fence immediately adjacent to the Rancho Vista properties. Following abandonment of the construction project, due to an executive branch policy change, Rancho Vista filed this claim, arguing that the impacts of pausing construction (construction debris, continues flow of immigrants, and environmental damage) amount to a physical taking of Rancho Vista properties. The United States moves to dismiss these claims by arguing that no liability can flow from government inaction or actions attributed to third parties. Because the United States cannot be held liable for third parties' actions, the Court dismisses Rancho Vista's Fifth Amendment claims based on increased immigration flow onto their property. The Court

---

[1] Robert Frost, *Mending Wall* (1914); *see also* Austin Allen, *"Mending Wall" How a Poem About a Rural Stone Wall Quickly Became Part of Debates on Nationalism, International Borders, and Immigration*, Poetry Foundation (https://www.poetryfoundation.org/articles/150774/robert-frost-mending-wall) (last accessed Dec. 27, 2023).

orders Rancho Vista to amend its Complaint to allege additional facts with regards to its construction debris and environmental damage claims.

## I.     Factual Background

Rancho Vista owns 1,137.12 acres of improved and unimproved land in the Otay Mesa area of San Diego County, California, adjacent to the Mexican border. (*See* Compl. at 2, ECF No. 1). As of early 2019, the U.S.-Mexico border fence stretched from the Pacific Ocean to a point near Rancho Vista's properties, where it stopped, then picked up several miles to the east. (*Id*. at 4). Presidential Proclamation 9844 of February 15, 2019, declared that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency." 84 Fed. Reg. 4949. The 2019 Proclamation authorized the Secretary of the Department of Defense ("DoD") to use construction funding for projects at the southern border. *Id*. The DoD Secretary authorized 11 military construction projects along the border, including the "San Diego 4" project adjacent to Rancho Vista properties. (Compl Ex. 4 at 2–4, ECF No. 1-4). This project involved constructing one and one-half miles of new primary pedestrian barrier and two miles of new secondary pedestrian barrier to form a contiguous line with preexisting barriers. (*See id*.; *see also* Compl. Ex. 5, ECF No. 1-5).

In 2019, Rancho Vista deeded a parcel to the United States to construct parts of the border fence. (Compl. at 7). Later, Rancho Vista also signed a Lease and Access Agreement with the United States' border fence construction contractor. (*Id*.). That lease allowed the contractor property access and storage space for construction materials.[2] (*Id*.). To facilitate construction, Rancho Vista granted the contractor access to existing dirt paths, the project site, the southeastern corner of the Rancho Vista properties, and any location proximate to the roads. (*Id*.). Plaintiffs do not allege any physical occupancy of their property by the United States. (OA Tr. 30:8–13 (Rancho Vista answering in the negative to the Court's inquiry as to whether there are "any . . . equipment or supplies" on Rancho Vista's land), ECF No. 22).

The contractor had completed all but 700 feet when President Joe Biden issued a proclamation directing a pause in border construction projects, including San Diego 4. President Biden specifically stated:

> "Like every nation, the United States has a right and a duty to secure its borders and protect its people against threats. But building a massive wall that spans the entire southern border is not a serious policy solution. It is a waste of money that diverts attention from genuine threats to our homeland security.
>
> …

---

[2] Rancho Vista has not alleged that the United States or its contractor's conduct was in breach of parties' agreements, and the parties agree that the construction took place on the United States' property. (Oral Argument ("OA") Tr. 22:3–10, ECF No. 22).

> It shall be the policy of my Administration that no more American taxpayer dollars be diverted to construct a border wall."

*See* Proclamation No. 10142, 86 Fed. Reg. 7225 (Jan. 20, 2021).[3] That unfenced gap in the border wall is the basis of this dispute.

Rancho Vista's takings claims relate to the residual impact of the United States' decision to pause construction. Rancho Vista alleges that the United States did not remediate the parcel deeded to the United States. (Compl. at 8).[4] Rancho Vista adds that the area United States accessed "comprised of mountainous, rugged terrain consisting of steep bluffs and rock-faced slopes that have been excavated in anticipation of construction," and that the United States, "left on-site, but not yet installed . . . special water pipes that will collect the storm water runoff from this rugged terrain and convey it safely away from the site." (*Id.*). Rancho Vista alleges that the abandonment of the construction site has "caused erosion [and] de-sedimentaion" when the stormwater runoff follows the "natural topography" of the area and reaches Rancho Vista properties. (*Id.* at 9–10; OA Tr. 30:15–17; Pl.'s Resp. at 13, ECF No. 11). The gap left in the border wall, Rancho Vista claims, also channels "undocumented immigrants who, in the hundreds[,] nightly pass through the opening," and "stream across the Rancho Vista properties." (Compl. at 10).

Plaintiffs also allege that portions of the Rancho Vista properties are designated as "non-native grassland, a fragile and rare habitat protected by California law," with other parts being within or near "coastal wetland habitat, seasonal Vernal pool wetland habitat," or other "occupied endangered species habitat." (*Id.* at 8). Rancho Vista alleges that these properties also protect 85 species that are prioritized for protection under the San Diego County Multiple Species Conservation Program, including a federally designated critical habitat for: the Quino checkerspot butterfly, the San Diego fairy shrimp, the Riverside fairy shrimp, the coastal California gnatcatcher, the Otay tar plant, and the Least Bell's Vireo. (*Id.* at 3). The United States' construction has caused "destruction of habitat, and threatened the continued existence of endangered species on and near," Rancho Vista properties, the Complaint alleges. (*Id.* at 10).

The United States argues that Rancho Vista's Fifth Amendment claims are unavailing for two reasons: first, Rancho Vista's claims fail to identify "affirmative acts by the United States," and second, that any takings claims based on alleged trespasses fail as a matter of law because

---

[3] One year later, the Department of Homeland Security reported the "largest ever surge of migrants (2.7M encounters in FY 2022) at the Southwest U.S. border." OIT Year End Review: Fiscal Year 2022, U.S. Customs & Border Protection at 4, https://www.cbp.gov/sites/default/files/assets/documents/2023-Jan/cbp-oit-executive-summary-yir-2022.pdf (last accessed Dec. 27, 2023).

[4] In reviewing a motion to dismiss, the Court must accept all factual allegations as true and draw all reasonable inferences in the claimant's favor. *See Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

the United States cannot be liable for the actions of third parties. (Def.'s Mot. to Dismiss at 6–7, ECF No. 10).

## II.  Analysis

Under RCFC 12(b)(6), the Court can dismiss a claim for "failure to state a claim upon which relief can be granted." That occurs when "no additional proceedings would enable the plaintiff to prove facts entitling him or her to prevail." *Northrop Grumman Corp. v. United States*, 63 Fed. Cl. 38, 41 (2004). To survive a motion to dismiss the allegations in the complaint must raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). When deciding on a motion to dismiss based on failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *Northrop*, 63 Fed. Cl. at 41; *see also Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011). In its review, the Court "may consider judicially noticeable matters outside the pleadings without converting a Rule 12(b)(6) motion into one for summary judgment." *CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1360 (Fed. Cir. 2019). Facts in government documents that are available through reliable sources and not reasonably subject to dispute are judicially noticeable. *Terry v. United States*, 103 Fed. Cl. 645, 652 (2012).

The Federal Circuit has developed a specific framework for takings claims that involve actions by third parties. First, government action directed to a third party does not give rise to a taking if its effects on the plaintiff "are merely unintended or collateral," and second, even if the effects are direct and intended, takings liability should be limited to cases where "the third party is acting as the government's agent or the government's influence over the third party was coercive rather than merely persuasive." *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1154 (Fed. Cir. 2014).

In *Welty v. United States*, the property owner alleged that the neighbor's maintenance of a levee and the flooding it allegedly caused amounted to a taking because the neighbor had signed a voluntary contract with the United States Department of Agriculture to receive government benefits, in the form of monetary compensation, for maintaining the levee. 135 Fed. Cl. 538 (Fed. Cl. 2017). The Court rejected the property owners' claim that a taking arose out of third-party action by emphasizing that the third-party action must be "required by or coerced by" the United States to amount to a taking and not merely encouraged. *Id.* at 550–51. In another set of similar cases, where the government's regulation of navigable waters directly causes flooding or other damage to private property, the underlying logic is the same: the United States can be liable for a taking because the United States is deemed to have "exclusive control" over that instrument of harm. *See Owen v. United States*, 851 F.2d 1404, 1408 (Fed. Cir. 1988). The same reasoning follows in cases involving trespass by livestock; there, the Court has also rejected takings theories arising out of third-party action by reiterating that the government's regulatory control over livestock movement in an area is not enough to establish a takings claim because livestock conduct is not "properly controlled in the first instance," by the government. *See e.g.*, *Alves v. United States*, 133 F.3d 1454, 1457–58 (Fed. Cir. 1998); *see also Bench Creek Ranch, LLC v. United States*, 855 F. App'x 726 (Fed. Cir. 2021).

Rancho Vista analogizes this case to cases it broadly categorizes as "right to exclude" cases. in which the United States directs encroachments onto or towards the property owners' land against their will. (Pl.'s Resp. at 15–18). These cases include *Nollan v. California Coastal Commission*, where the Supreme Court held that conditioning a building permit on a grant of a public easement (to allow the public to access the beach over private land) constitutes a compensable taking. 483 U.S. 825 (1987). In another "right to exclude" case, *Kaiser Aetna v. United States*, the government's decision to grant the public a right of access to a previously private lagoon constituted a compensable taking. 444 U.S. 164 (1979). Similarly, in *Cedar Point Nursery v. Hassid*, the Supreme Court held that a regulation allowing union organizers to enter private property constitutes a per se physical taking. 141 S. Ct. 2063 (2021). As Rancho Vista argues, in these cases the government "created the conditions and circumstances—the opportunity—for the taking to occur," by a third party (either the public or the government's agents). (Pl.'s Resp. at 22).

However, in none of the supporting cases cited by Rancho Vista has a Court held the United States liable for actions by third parties that the United States cannot control in the first instance—let alone actions that constitute violations of federal law. (OA Tr. at 12:7–10 (United States: "In fact, the United States has made it illegal to cross the southern border at any place other than an authorized port of entry, and this place, this gap in the fence, is not an authorized port of entry."); *see also* Compl Ex. 4 at 1 (authorizing construction of the fence to "deter illegal entry")). In contrast, in each case cited by Rancho Vista, the government expressly provided those third parties with the right to engage in the activity that allegedly invaded private property.

The correct standard for compensable taking is not merely creating the conditions and circumstances for a taking—as Rancho Vista would have the Court find. Rather, as the Federal Circuit has noted, a property loss compensable as a taking "*only results*" when the asserted invasion is either the direct result of an activity "authorized" by the government or, alternatively, when the government "intends to invade" the protected property interest. *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003) (emphasis added). The migrant flow in this case is not "authorized" by the government. And it cannot be said that the government "intends" to encourage or endorse that activity. (OA Tr. 44:21–45:2 (Rancho Vista acknowledging that this case does not present the situation in which the United States "either . . . authorized this person to in effect act on behalf of the government, or compelled" the activity)); *see also Mountain States Legal Found. v. Hodel*, 799 F.2d 1423, 1428 (10th Cir. 1986) (rejecting takings claims based on trespass by protected wildlife because that harm was not imposed by "instrumentalities of the government whose presence constitutes a permanent governmental occupation").

This case is therefore distinguishable from "right to exclude" cases cited by Rancho Vista where the asserted activity (public ingress and egress) undoubtedly occurred after the government affirmatively authorized or endorsed that activity. (*See* OA Tr. 41:2–4 (Rancho Vista: "[C]an I cite you a case in which the Fifth Amendment takings clause has been applied directly to facts just like this? No.")). Unlike those cases, neither of the conditions identified by the Federal Circuit is met when the underlying activity is illegal conduct. Rancho Vista has not cited any other case in which the United States was held liable for a taking resulting from underlying conduct by third parties that the United States treats as unlawful. *See Mahoney v. United States*, 129 Fed. Cl. 589, 593 (2016) (plaintiffs seeking compensation for a taking "must concede the validity of the government action which is the basis of the . . . claim," and cannot

premise the takings claim "on the unlawfulness of the alleged government act."); (*see also* OA Tr. 35:10–19 (Rancho Vista acknowledging that border patrol officers are engaging with persons crossing the border "daily, and especially nightly")). As such, the Court rejects Rancho Vista's argument that unlawful trespass by migrants can constitute a compensable taking. Rancho Vista's claim as to immigrant flow must be dismissed for failure to state a claim.

The United States also argues that Rancho Vista's claims should be dismissed because they are "squarely premised on the alleged failure of the United States to complete the construction" of the fence and the "impacts from" what amounts to a "failure to act." (Def.'s Mot. at 14 (citing *St. Bernard Parish Gov't v. United States*, 887 F.3d 1354 (Fed. Cir. 2018)). In *St. Bernard Parish*, the Federal Circuit rejected a takings claim based on the United States' "construction, continued operation of, and failure to maintain or modify," flood banks in the aftermath of Hurricane Katrina. 887 F.3d at 1358, 1360 (finding that while "the theory that the government failed to maintain or modify a government-constructed project may state a tort claim, it does not state a takings claim."). Under *St. Bernard*, the property loss compensable as a taking must be linked to an "asserted invasion [that] is the direct, natural, or probable result of authorized government action." *Id.* at 1360. The United States analogizes this case to cases such as *Board of Supervisors of Issaquena County v. United States*, (decided in the aftermath of *St. Bernard Parish*) where the United States' failure to fully implement a plan (in that case, installing pumping systems to control drainage) did not support a claim for Fifth Amendment taking. (Def.'s Mot. at 15 (citing *Issaquena Cnty*, 160 Fed. Cl. 300, 302, 304 (2022))).

Under *St. Bernard Parish*, property owners must also establish that they would not have suffered the injury "in the ordinary course of events, absent government action." 887 F.3d at 1362 (causation analysis). In the flooding context, this means plaintiffs must show that their land is *more* burdened by flooding than it would have been prior to construction. *Bd. of Supervisors of Issaquena Cnty v. United States*, 84 F.4th 1359, 1366 (Fed. Cir. 2023).

The Federal Circuit has reiterated that *St. Bernard Parish* forecloses takings claims rooted in the government's inaction, but not those that are direct results of "affirmative acts." *Id.* at 1365 (". . . as we have held, 'takings liability must be premised on affirmative government acts.'") (citing *St. Bernard Parish*, 887 F.3d at 1362). Rancho Vista's Complaint articulates the claims in a manner that evokes government inaction, as opposed to affirmative acts. Paragraphs 17 and 18 of the Complaint claim that the United States harmed Rancho Vista through "[t]he abandonment of the construction site." Paragraph 20 traces the harms to the United States' decision to "immediately cease all work." Paragraph 21, similarly, challenges the United States' "failure to complete," the project. As the Federal Circuit has held, though, "[t]o the extent [that takings] allegations rest on the government's failure to," do something, such allegations "fail to state a claim." *Issaquena* Cnty, 84 F.4th at 1369.

Rancho Vista responds to the motion to dismiss by claiming that the Complaint "alleges affirmative Government actions to build the fence just as it now exists and that those Government actions have destroyed Rancho Vista's mitigation land by directing migrants to the only open door along an otherwise contiguous border fence in San Diego." (Pl.'s Resp. at 13). A takings theory based on what the United States has constructed thus far (as opposed to its failure to construct more) is an example of a "'sole affirmative act[] . . . that might form the basis" of a valid takings claim. *See Johnson v. United States*, 2023 U.S. Claims LEXIS 33 *10–11 (Fed. Cl.

Jan. 31, 2023) (citing *St. Bernard*, 887 F.3d at 1362); *see also Ridge Line*, 346 F.3d at 1351–55, 1359 (a dam construction project can result in at taking so long as the predictable negative impact on the property is directly caused by what the government has constructed). Yet, unlike the United States' direct references to the actual language in the Complaint, this statement by Rancho Vista in response does not appear in the Complaint. (*See* Pl.'s Resp. at 13, *see also* Compl.); *Bd. of Supervisors*, 84 F.4th at 1367 (the complaint "on its face" must plausibly allege the correct legal theory). It is not enough for Rancho Vista to articulate the correct theory only in response to the United States' objection. Rather, to survive the motion to dismiss, those allegations must be clearly pled in the Complaint. *Id.* at 1369 ("If the Board had articulated in its Amended Complaint all that it has argued to us . . . that might have been sufficient to allege but-for causation."). Rancho Vista's Complaint, in its present form, falls short of that standard. *See e.g.*, *id.* at 1365 ("The government's failure to install pumps or to construct an additional floodway cannot result in takings liability.").

Under *St. Bernard*, Rancho Vista's Complaint must also explain why additional construction under San Diego 4 left Rancho Vista in a worse place than it would have been with the prior wider gap in the border wall. 84 F.4th at 1369 ("To the extent that the Board is alleging that the construction of the Backwater Project caused flooding," as opposed to government inaction, "the complaint fails to explain (or even directly allege) how the Project brought about a worse result than would have occurred anyway."); *see also e.g., In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*, 138 Fed. Cl. 658, 662 (Fed. Cl. 2018) (causation was satisfied when the Army Corp had conceded that under its flood control project the surrounding areas might be flooded, leaving plaintiffs worse off, and that the project "could result in lawsuits against the Corps of Engineers for flooding private lands"). Rancho Vista acknowledges that the Complaint falls short of this standard as well. (OA Tr. 36:20–37:4 (Rancho Vista responding to the Court's inquiry ("[I]s there anywhere in the complaint that alleges the migrant crossing have increased since the narrowing of the gap in this wall?) by noting: "[i]t is not in the complaint . . . ."); *see also* OA. Tr. 38:13–17 (Rancho Vista acknowledging that under *St. Bernard*, the cause of action "would only be sufficient if the [harm] was actually worse than it had been before")).

In similar cases, the Federal Circuit has allowed plaintiffs to amend their complaint to articulate the correct theory about inaction and causation. *Bd. of Supervisors*, 84 F.4th at 1370 ("[W]here the plaintiff's allegations in its brief on appeal may be sufficient to state a claim and where the government does not assert meaningful prejudice—we believe that we can appropriately exercise our discretion to provide the Board an opportunity to seek leave to amend one last time and attempt to state a plausible takings theory based on government action."); (*see also* OA Tr. 39:21–24 (Rancho Vista requesting amendment of complaint)). While that remedy would normally be appropriate, here, it would not resolve the Court's main finding that the harms caused by third parties in this case cannot be attributed to the United States.[5] The Court therefore grants the United States motion to dismiss as to the claims related to immigration flow.

---

[5] While the United States acknowledges that other defects with the Complaint (including inaction challenges and deficiency in asserting causation) could potentially be remedied by amending the

Rancho Vista's complaint also advances two other claims: first, that Rancho Vista properties are suffering erosion and de-sedimentation as a result of runoff from government construction on the site and, second, that the environmental impacts of the construction have damaged environment valuable for endangered species. (Compl. at 8–10). The United States also avers that should the Court allow for an amendment as to these claims, "additional details," will be needed to flesh out these claims that, while plausible, are almost treated as "after thought" in the Complaint. (OA Tr. 25:1–9; *see also* OA Tr. 52:23–53:3 (the United States: " . . . the standard for amendment is fairly liberal . . . and, as we've noted, there may be a claim for erosion here that may go forward.")). The Court also noted during the oral argument that, while the map attached to the Complaint depicts "numerous parcels" that span a wide area, there are no specific facts alleged to identify which parcels are specially impacted by the runoff or particularly suffer from loss of mitigation credit for endangered species. (*See* OA 33:12–22 (Rancho Vista admitting that "not all of the parcels have this special habitat that can be used for mitigation purposes" and that an amended complaint "can make that known")). Rancho Vista requests an opportunity to file an amended complaint to address the gaps in the Complaint. (Pl.'s Resp. at 26; OA Tr. 39: 21-25 (". . . we have requested in our reply, and I will request now, that we be allowed to amend the complaint . . .")). Therefore, while the Court finds that Rancho Vista can proceed with its environmental impact and erosion claims, a timely amendment may be needed to specify the degree of impact on each identified parcels and to allege any additional facts needed to plausibly establish a claim for erosion damage.

### III.     Conclusion

Accordingly, the Court **GRANTS-IN-PART** the United States' Motion to Dismiss, (ECF No. 10), as to Plaintiffs' illegal immigrant crossing claims. The Court **ORDERS** Plaintiffs to file an amended Complaint by or before **February 9, 2024**.

The Court **ORDERS** the Parties to meet and confer regarding proposed dates and times for a site visit in this case and collecting any logistical information needed for accessing the site. A Joint Status Report with that information as well as the Parties' proposed schedule for future proceedings in this case is due on or before **February 2, 2024**.

**IT IS SO ORDERED.**



s/     David A. Tapp
DAVID A. TAPP, Judge

---

Complaint, the United States also argues that the independent actor challenge cannot. (OA Tr. 52:11–12 (arguing that amending the Complaint "will not address the third-party issue . . ."); 53:5–7 (". . . we would opposed any amendment as futile to the extent it includes any allegations about migrants")).