# In the United States Court of Federal Claims

No. 23-125
Filed: July 14, 2026
Reissued: July 30, 2026[†]

| |
|---|
| **RANCHO VISTA DEL MAR, et al.,** |
| ***Plaintiffs*,** |
| **v.** |
| **THE UNITED STATES,** |
| ***Defendant*.** |

*Roger J. Marzulla*, *Nancie G. Marzulla*, and *Mollie A. Jackowski*, Marzulla Law, LLC, Washington, D.C., for Plaintiffs.

*Kimberly A. Cullen*, Trial Attorney, *Young Kang*, Trial Attorney, *Erika Norman*, Trial Attorney *Adam F. Gustafson*, Principal Deputy Assistant Attorney General, Environment & Natural Resources Division, U.S. Department of Justice, with *Robert Walker*, *Raul Chiriboga*, *Thomas Miller*, *Michael Felts*, *Christopher Shaw*, *Allan Thorson*, *Amy Dell*, and *Douglas OttenWess*, Of Counsel, U.S. Department of Homeland Security; also joined by *Daniel Inkelas*, *Mary Wrightson*, *Edmond C. Lambert*, and *Capt. Steven Foster*, Of Counsel, U.S. Army Corps of Engineers, Washington, D.C., for Defendant.

**POST-TRIAL OPINION AND ORDER**

**TAPP, Judge.**

This case involves a relationship born of necessity yet marked by longstanding contention. Plaintiffs, a related group of property owners referred to singularly as "Rancho," return to court seeking redress for the United States Customs and Border Protection's continued use of their property. The first iteration of this litigation culminated in *Otay Mesa Property L.P.*

[†] This Opinion was originally issued under seal, (ECF No. 181). The Court provided parties with the opportunity to submit proposed redactions. The Court accepts all proposed redactions. (*See* Joint Status Report, ECF No. 185). The sealed and public versions of this Opinion differ only to the extent of those redactions, the publication date, and this footnote.

*v. United States (Otay Mesa I)*, 86 Fed. Cl. 774, 775 (2009), *aff'd*, 670 F.3d 1358 (Fed. Cir. 2012).[1] This litigation is a continuation of that decision.

This case arises where land and law enforcement meet at the southern edge of the nation, and where the effects of federal action are measured not in abstraction, but across real terrain involving real people—landowners, many thousands of migrants, and those charged with protecting our borders. According to Rancho, incomplete construction of the border wall, which left a 700-foot gap between Rancho's property and Tijuana, Mexico, increased federal law enforcement presence on their property and transformed the nature of the property's use. The Court is tasked with determining whether that alleged transformation is borne out by evidence, and whether it rises to the level of a Fifth Amendment taking. The evidence establishes that Border Patrol's installation and operation of sensors effected a taking. Yet Rancho chose to litigate this case under a temporary takings theory and failed to present evidence permitting the Court to determine just compensation under the facts proved. Put simply, the record establishes liability but not the amount of compensation.

## I. Procedural History

In its first Complaint, Rancho claimed that a gap in the border wall was responsible for increasing the number of undocumented migrants traversing across their land and environmental damage which resulted in a taking. (Compl. at 9–10, ECF No. 1). On the United States' motion, the Court partially dismissed Rancho's takings claim based on unlawful migrant crossings. *See Rancho Vista Del Mar v. United States*, 169 Fed. Cl. 299 (2024); (docketed at ECF No. 23). That partial dismissal reiterated that takings liability must be premised on affirmative government action rather than inaction and found that the Complaint failed to adequately plead such acts. *Id.* at 304–05. In doing so, the Court foreclosed Rancho's theory that the United States could be liable for damages attributable to migrants illegally entering through the border gap. *Id.* at 305. However, the Court permitted Rancho to amend its environmental impact and erosion claims to better articulate causation, specify the impact on each parcel, and allege additional facts sufficient to plausibly establish a takings theory based on government action. *Id*. at 306.

Given the Court's instructions, Rancho filed an Amended Complaint alleging that the United States Border Patrol's ("Border Patrol") activities on its property were so extensive as to affect a taking. (*See* Am. Compl., ECF No. 26). The Amended Complaint alleged that, following implementation of the federal government's "open-borders policy," a substantial increase in undocumented migrant crossings in the San Diego Sector led to heightened Border Patrol activity on Rancho's properties, including all-terrain vehicle ("ATV") patrols, migrant

---

[1] In *Otay Mesa I*, the Court dismissed Plaintiffs' claims based on Border Patrol's presence on the property as time-barred. 86 Fed. Cl. at 788. On appeal, the Federal Circuit held that the United States had effected a permanent easement by installing sensors throughout Rancho's property and was therefore liable for a taking on that basis. *Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1365 (Fed. Cir. 2012).

apprehension and transportation operations, and the placement of tracking equipment. (*Id.* at 10–11). According to Rancho, these activities caused extensive environmental damage to sensitive land and wildlife habitat, interfered with Rancho's right to exclude others, and effectively resulted in the taking of an easement for ingress and egress across the subject properties. (*Id.* at 11).

Again, the United States moved to dismiss Rancho's Amended Complaint. (Second Mot. to Dismiss, ECF No. 32). The Court denied that Motion. *See Rancho Vista Del Mar v. United States*, 173 Fed. Cl. 159 (2024) (docketed at ECF No. 37). Specifically, the Court found that Rancho plausibly alleged that Border Patrol agents and equipment, including ATVs and mobile surveillance towers, regularly entered and operated on Rancho's property in connection with federal border enforcement activities, causing damage to the land and interfering with Rancho's right to exclude others. *Id.* at 167. Additionally, the Court noted that whether these activities were truly based on affirmative government action rather than governmental inaction was an issue to be resolved later. *Id.* That sequence set the stage for trial.

## II. Findings of Fact[2]

### *A. The Property*

The property is comprised of eight parcels collectively owned by Plaintiffs, Rancho Vista Del Mar, Otay International, LLC, Otay Mesa Property, L.P., and D&D Landholdings (the "Property"). (Amended Joint Stipulations of Facts ("Am. JSOF") at ¶¶ 1–9, ECF No. 135). The parcels are described as follows:

- Plaintiff Rancho Vista Del Mar owns Parcel Nos. 648-090-05 (approximately 496.56 acres) and 648-080-08 (approximately 40 acres). (*Id.* at ¶¶ 2–3).

- Plaintiff Otay International, LLC owns Parcel Nos. 648-090-01 (approximately 40 acres), 648-080-21 (approximately 40 acres), 648-080-22 (approximately 40 acres), and 648-080-10 (approximately 40 acres). (*Id.* at ¶¶ 4–7);

- Plaintiff Otay Mesa Property L.P. owns Parcel No. 648-080-19 (approximately 74.55 acres). (*Id.* at ¶ 8)

- Plaintiff D&D Landholdings owns Parcel No. 648-080-26 (approximately 20 acres). (*Id.* at ¶ 9).

Together, these parcels make up 791.11 acres of land adjacent to the southern border. (*Id.* at ¶¶ 1–9).

---

[2] To the extent they are relevant, the Court adopts the findings in prior and related opinions. A comprehensive recitation of facts can be found in the Court's Opinions regarding the United States' previous Motions to Dismiss. *Rancho Vista Del Mar v. United States*, 169 Fed. Cl. 299, 301 (2024); *Rancho Vista Del Mar v. United States*, 173 Fed. Cl. 159 (2024).




(Joint Exhibit ("JX") 46 (map of the Property)). SD Commercial, LLC manages the Property. (Am. JSOF at ¶ 10).

### *B. Border Patrol Activities*




(DX 66)

Border Patrol's charge is to defend the United States' borders from threat. (Trial Transcript[3] ("Tr.") Woods, 269:8–9). Because the southern border of Rancho's property runs adjacent to the border of Mexico, Border Patrol agents have conducted immigration enforcement operations on the property since the 1970s. (Tr. D. Wick, 329:16–332:25; Am. JSOF at ¶ 1; JX 46); *see Otay Mesa I*, 86 Fed. Cl. at 775. Border Patrol divides its operations along the southern border of Rancho's property into Sectors, which are further divided into Stations and administratively organized into Zones, with each Station

[3] The Trial Transcript consists of 847 pages and is separated into four volumes located at ECF Nos. 153 (pp. 1–174), 155 (pp. 175–394), 157 (pp. 395–648), and 159 (pp. 649–847). The Court cites the Transcript using the name of the testifying witness, counsel, or the Court, then the consecutive pagination and line numbers, (Tr. NAME, __:__–__).

responsible for patrolling several Zones. (Tr. Woods, 269:21–270:16). Specifically, Rancho's property is located in the San Diego Sector, within Zones [redacted] and [redacted] of Chula Vista Station's area of responsibility. (*Id.*, 239:25–240:7, 242:1–3; Am. JSOF at ¶¶ 27–29; Defendant's Exhibit ("DX") 66).

Border Patrol uses jeeps, trucks, night-vision-scope trucks, vans, ATVs, shuttle buses, minibuses, and foot patrols to apprehend individuals suspected of violating criminal or immigration laws. (Am. JSOF at ¶ 30; Tr. Woods, 252:10–253:3). To further effectuate its mission, Border Patrol also uses drones, portable flood lights, and hidden ground sensors to [redacted]. (Tr. Lopez, 183:23–25, 195:23–196:5; JX 32, 53, 30-0008; Tr. Woods, 265:9–266:6).

### *C. Border Fence Construction*

On February 15, 2019, the President of the United States issued Proclamation 9844, declaring a national emergency concerning the southern border of the United States. (Am. JSOF at ¶ 11). In early 2019, the United States purchased 17.04 acres from Rancho in anticipation of future border fence construction projects, and as a result owned a 17.04-acre strip of land between the southern border of Rancho's property and the United States-Mexico border to construct a border fence.[4] (*Id.* at ¶ 12). Acting under 10 U.S.C. § 2808, the Secretary of Defense authorized eleven border fence projects, including the San Diego 4 Project. (*Id.* at ¶ 13). The San Diego 4 Project involved construction of approximately 1.5 miles of primary steel fencing and 2 miles of secondary steel fencing near the Otay Mesa Port of Entry. (*Id.* at ¶ 14). This construction required a continuous line of fencing along the southern border adjacent to Rancho's property. (*Id.*).

In early 2020, a contractor acting on behalf of Border Patrol contracted with Rancho to use three acres of Rancho's property for the staging and storage of construction materials in exchange for monthly rent payments. (Am. JSOF at ¶¶ 15–16; JX 12). Construction began on the segment of border fencing adjacent to the Property in March 2020. (Am. JSOF ¶ 19). A second agreement between the contractor and Rancho permitted access to the border fence construction site through the Property. (JX 13-0002, ¶¶ 2, 6–7). That second agreement also authorized the contractor to utilize an access route on the Property known as the "Red Road" and permitted the contractor to grade and use the road throughout construction. (*Id.*; *see* Am. JSOF at ¶ 18).

On the date of the presidential transition in 2021, the President of the United States terminated Proclamation 9844. (Am. JSOF at ¶ 20). This termination eliminated funding for border fencing projects and consequently immediately paused border wall construction including the San Diego 4 Project. (*Id.* at ¶¶ 21–24). The pause in construction left an approximately 700-foot gap in the primary and secondary steel fencing immediately south of Rancho's property. (*Id.*

---

[4] As a result of the United States' acquisition of this property, Rancho no longer owns land extending to the southern border. (JX 47-0005; Tr. Enriquez, 514:3–7, 521:7–12, 521:14–522:3). Rather, the United States now owns all land from the international boundary line to approximately 30 feet north of the secondary barrier. (*Id.*).

at ¶ 25; JX 30-0009). This gap remained open until the primary fencing was closed on August 18, 2025, a period of four years, three months and eighteen days. (Am. JSOF at ¶ 26).

*D. Migrant Flow Through the Gap on to Rancho's Property*

Border fencing, particularly in the San Diego sector, has been largely effective in reducing the number of illegal immigrants crossing international borders. (Tr. Hankinson, 50:11–14). Border fence vulnerabilities create a funneling effect because migrants seeking to enter the United States tend to target gaps in border fencing as paths of least resistance.[5] (*Id.*, 37:23–38:9). Consistent with that pattern, the 700-foot gap at issue here initially prompted Border Patrol to [redacted]. (Tr. Woods, 244:9–14, 277:6–17, 278:9–11). This surge of migrants was largely comprised of family units seeking to surrender directly to Border Patrol rather than evade detection and continue into the country.[6] (*Id.*, 275:7–13). [redacted]. (Tr. Woods, 277:18–25, 279:1–4). Border Patrol data showed the number of apprehensions on the Property nearly [redacted] in 2021 compared to the previous year. (JX 52). However, that data comes with a caveat: increased apprehensions do not necessarily corelate to an increase in the number of Border Patrol agents present on the Property. (Tr. Woods, 249:2–5). Generally, [redacted], the area in which the 700-foot gap is located. (*Id.*, 278:1–5).

Data from Border Patrol's national records system demonstrated that migrant apprehensions on the Property increased in 2021 compared to 2020 levels:

---

[5] Mr. Hankinson visited the Property two years prior to trial. He took various photographs depicting what he characterized as illegal immigrants crossing onto the Property. (*Id.* at 38:23–39:2; PX 19-019 (image of six immigrants waiting to be picked up by Border Patrol); PX 13 (video of man walking through gap onto the Subject Property)).

[6] According to Mr. Woods, this represented a demographic shift from "single adults crossing the border" or "smaller groups of individuals" that "were trying to abscond" and "did not want to be encountered by law enforcement." (Tr. Woods, 274:19–275:13).

[redacted]

(Tr. Larimore, 459:15–23; JX 52-0001).[7] Apprehension numbers continued to exceed pre-gap levels until January 2025, when Border Patrol recorded a sharp decline in apprehensions. (JX 52-0005). Importantly, the number of apprehensions does not necessarily correlate on a one-for-one basis with the number of agents on the property. (Tr. Larimore, 468:3–11 (explaining that [redacted])).

## III. Conclusions of Law[8]

### *A. Standard of review in Fifth Amendment takings cases.*

The Tucker Act grants this Court exclusive jurisdiction over Fifth Amendment takings claims brought against the United States for amounts greater than $10,000. *Morris v. United States*, 392 F.3d 1372, 1375 (Fed. Cir. 2004) (citation omitted). Under the Takings Clause of the Fifth Amendment, "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V. Thus, "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning*

---

[7] Two categories comprise the total number of apprehensions reflected in this chart: Title 8 apprehensions (violations of Title 8, or immigration law), and Title 42 encounters (enforcement authority used by Border Patrol during COVID-19 outbreak to expel migrants). (Tr. Larimore, 463:25–464:7); 8 U.S.C. § 1325; 42 U.S.C. § 265.

[8] The Court will include additional findings of fact as necessary for the conclusions reached below.

*Agency*, 535 U.S. 302, 322 (2002) (citing *United States v. Pewee Coal Co.*, 341 U.S. 114, 115 (1951)).

The Court applies a two-part analysis to assess the validity of physical takings claims, determining: (1) whether the claimant has identified a "cognizable Fifth Amendment property interest[,]" and (2) whether that property interest was "taken." *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009) (citations omitted). The Court will not proceed to the second step "without first identifying a cognizable property interest." *Id.* (quoting *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005)). A cognizable property interest is typically indicated by the ability to sell, assign, transfer, or exclude. *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012). Rancho's ownership of the properties is undisputed. (Am. JSOF at ⁋⁋ 1–9). Therefore, the Court determines if Rancho's property was "taken." *Hearts Bluff Game Ranch, Inc.*, 669 F.3d at 1329 (internal quotations omitted).

A physical taking arises when government action results in a physical invasion or occupation of private property, effectively serving as the functional equivalent of a "practical ouster of [the owner's] possession." *Transportation Co. v. Chicago*, 99 U.S. 635, 642 (1878); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982). Liability is established when a taking occurs, and the private party remains uncompensated. *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 315 (1987) (finding that the Takings Clause "is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking."). Once a property owner experiences a physical intrusion, the government must provide just compensation, regardless of how minor the disruption is or how compelling the public interest might be. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992).

*B. Rancho's taking claim arises from the installation of new sensors, rather than from an increase in Border Patrol activity.*

To demonstrate liability, Rancho needed convincing evidence that the actions of the Border Patrol increased to such a degree that it affected a taking. Rancho's claims are premised on a pause in construction of the border fence which resulted in a 700-foot gap from 2021 to 2025. (Tr. Pls.' Counsel, 13:8–17). The parties agree that at most the taking is temporary. (*See* Tr. Pls.' Counsel, 17:11–14 ("[The] United States has effected a temporary taking of a use easement[.]"); Def.'s Counsel, 18:21–24 ("[B]ecause the gap closed . . . any claim for a taking is temporary.")).

Rancho's taking claim must be based on government action, not that of migrants. *Rancho Vista Del Mar*, 173 Fed. Cl. at 166 (citing *St. Bernard Parish Gov't v. United States*, 887 F.3d 1354, 1362 (Fed. Cir. 2018)). Specifically, a plaintiff must "show that in the ordinary course of events, absent government action, [they] would not have suffered the injury." *St. Bernard Parish*, 887 F.3d at 1362–63 (also observing that the question the Court must decide is whether "the [] damage that actually occurred" was worse than "the [] damage that would have occurred if there had been no government action at all"). In this case, the question is whether construction of the 700-foot gap placed Rancho in a worse position than would have existed under the prior, wider

gap in the border wall. *See id.* Because Rancho's taking claims are premised entirely on the increase in enforcement activity resulting from the construction of the 700-foot-wide gap, they bear the burden of proving that such an increase in activity occurred. (Am. Compl. at 1).[9]

Here, Rancho's theory that construction of the 700-foot gap increased Border Patrol's operations to such a degree that it affected a temporary taking is belied by the evidence. Rancho relies primarily on apprehension data. (JX 52-0001). But, as discussed above, apprehension figures provide little insight into the number of Border Patrol agents involved in any given response. Indeed, senior Border Patrol personnel convincingly testified that apprehension data cannot be used to determine how many agents responded to a particular incident. (Tr. Woods, 249:2–5 ("The [apprehension] numbers don't necessarily dictate the amount of Border Patrol agents that would respond to the individuals entering the United States."); Tr. Larimore, 468:8–11 ("[I]t would be impossible to infer . . . how many agents it would take to make that number of apprehensions.")). Accordingly, the Court finds that apprehension figures alone do not establish that Border Patrol's operations increased to the extent alleged by Rancho.

Rancho likewise failed to provide evidence linking alleged damage to the property to increased Border Patrol activity. Rancho's expert on this point was unconvincing. Rancho's expert acknowledged that he had not considered Border Patrol activity on the property over prior decades and that, at times, he attributed debris left by migrants to Border Patrol. (Tr. Scheidt, 105:13–14, 107:22–25). He also conceded that his opinion did not rely on Border Patrol disclosures, operational data, or apprehension statistics. (*Id.,*109:13–18). Nor did he quantify habitat trampling before and after construction of the border wall. (*Id.*, 109:19–110:1).

Zachary Wick ("Mr. Zach Wick"), SD Commercial's Business Development Officer, has observed Border Patrol and ATVs operating on the property since at least 2013. (Tr. Z. Wick,

---

[9] The parties dispute whether Border Patrol is authorized to enter private property for purposes of enforcing the immigration laws. *See* 8 U.S.C. § 1357(a). The Court agrees with the United States the statute affords immigration officers broad authority to apprehend individuals "within a distance of twenty-five miles from any [] external boundary" of the United States. *Id.* Even assuming otherwise, however, neither party disputes Border Patrol's longstanding presence on the Property. Indeed, in *Otay Mesa I*, the trial court observed that by the mid-to-late 1990s Border Patrol's activities had become "highly visible" as agents occupied fixed positions on the Property to deter illegal immigration. 86 Fed. Cl. at 790 (describing Border Patrol's presence as "highly visible [by the mid-to-late- 1990s] as agents assumed fixed positions on the subject property to deter illegal alien activity."). The record in this case is no different. Additionally, Rancho introduced no evidence at trial disputing Border Patrol's historical use of the Property. Accordingly, to the extent Rancho contends that Border Patrol's mere presence on the Property constitutes a taking, such a claim was, and remains, time-barred. *See Otay Mesa I,* 86 Fed. Cl. at 787–791 ("[Border Patrol's] open and notorious use of the land put Plaintiffs on inquiry notice of the Border Patrol's activity and precludes them from arguing lack of knowledge."); 28 U.S.C. § 2501. Against this backdrop, Rancho must demonstrate that Border Patrol's activities following the creation of the 700-foot gap materially exceeded the scope of the use previously found to be time-barred in the prior litigation.

119:25–120:4, 148:15–22). According to Mr. Zach Wick, Border Patrol activity appeared to be at its highest level between 2021 and 2025, prompting him to begin documenting that activity by photograph. (*Id.*, 124:24–125:2, 150:23).[10] While helpful, the photographs used at trial did not confirm that every individual depicted in the photographs was a Border Patrol agent. (*Id.*, 158:16–159:5 (referencing PX 43)). While this testimony supports the undisputed proposition that Border Patrol operated on Rancho's property, there was little evidence from which the Court could determine the extent, if any, that Border Patrol activity *increased* because of the gap.

Mr. David Wick, the president of SD Commercial and property manager, likewise acknowledged substantial Border Patrol activity on Rancho's property long before construction of the gap. During his testimony in *Otay Mesa I*, Mr. David Wick stated that ten to fifteen Border Patrol agents were continuously present on the property in 2006, twenty-four hours a day, seven days a week. (DX 72-0144; Tr. D. Wick, 336:15–23 (Def.'s Counsel: "Was that your testimony in 2006?" Mr. David Wick: "Yes.")). Despite concerns about Border Patrol's activity, Rancho maintained no records comparing post-2021 Border Patrol activity with preexisting activity on the property. (Tr. D. Wick, 341:17–342:9). Taken altogether, none of the testimony or exhibits offered by Rancho permit the Court to assess the extent of Border Patrol activity on Rancho's property or establish any change in that activity resulting from the 700-foot gap.

Additionally, compelling testimony of Border Patrol officials [redacted] Border Patrol tracks staffing requirements, including the average number of agents assigned to a particular Zone each day. (Tr. Larimore, 461:11–22, 472:21–23). [redacted][11] (*Id.*). To be sure, Border Patrol data does not conclusively establish the number of agents present on Rancho's property. Nevertheless, that data and supporting testimony was convincing and uncontroverted by Rancho. Comparing anecdotal testimony suggesting increased activity against staffing data indicating a broader decline in agent levels, the Court finds that Rancho failed to demonstrate increased Border Patrol activity.

---

[10] The Court admitted many of the photographs taken by Mr. Zach Wick and are listed as follows: PX 31; PX 34; PX 43; PX 47; PX 52; PX 57; PX 62; PX 69; PX 75; PX 83; PX 90; PX 98; PX 100; PX 110; PX 112.

[11] This data contrast with the impression that Rancho employee, Mr. Zach Wick, attempted to portray. In Mr. Zach Wick's opinion, Border Patrol activity on the Property increased following construction of the gap in the years thereafter. (Tr. Z. Wick, 124:24–125:2, 150:23). However, his testimony was based largely on intermittent observation rather than contemporaneous records quantifying agent activity. (*Id.*, 150:15–151:1). While Border Patrol records staffing by Zone and not individual parcels, it is consistent. (*See* JX 50-0001–0004). Mr. Zach Wick's observations were sporadic.

Rancho's focus on Border Patrol's use of the Red Road is equally unavailing. The road existed prior to construction of the gap. (Tr. D. Wick, 313:12–16). Under the parties' agreement, Rancho authorized Border Patrol's contractor to use and improve the Red Road. (Am. JSOF ¶ 18; JX 13-0002, ¶¶ 2, 6–7). Although that agreement was later terminated, Rancho relies on internal Border Patrol communications to suggest that [redacted] That evidence, however, [redacted]; it does not quantify Border Patrol's use of the Red Road, nor does it demonstrate the increase in law enforcement activity necessary to show a taking.

Similarly, evidence of drone usage fails to support Rancho's claim that Border Patrol increased its presence on the Property. Border Patrol has used drones over Rancho's property since approximately 2019. (Tr. Lopez, 195:23–196:5). [redacted]

[redacted]

[redacted]

[redacted]

[redacted] this fails to convince the Court that Border Patrol increased activity on the property during the period of the gap. [redacted] Accordingly, Rancho's limited drone related evidence does not convince the Court that a temporary taking occurred.

The strongest support for Rancho's claim concerns Border Patrol's use of ground sensors. As explained in *Otay Mesa*, Border Patrol employs such sensors to detect individuals traversing the property. *Otay Mesa 1*, 86 Fed. Cl. at 777; (Tr. Woods, 265:9–266:6). In that litigation, the trial court determined that the United States effected a physical taking by installing and operating sensors on Rancho's property. *Otay Mesa 1*, 86 Fed. Cl. at 790–91; (JX 02). The Federal Circuit subsequently affirmed liability, concluding that the installation of the sensors constituted a permanent taking. *Otay Mesa Prop., L.P.*, 670 F.3d at 1365–1368.

Liability in *Otay Mesa* was premised on the United States' stipulation of liability relating to the ground sensors. That stipulation provided:

> A perpetual and assignable easement to locate, construct, operate, maintain and repair or replace the specified underground seismic intrusion sensors on the specified parcels, including the right to ingress and egress to each sensor location. The easement shall be deemed to have commenced on the date the sensor is listed as having been installed, and will continue until the sensor is no longer needed or the property is developed. Each sensor is and shall be located so as not to affect the functionality of the property. Should the landowner desire to develop any portion of the subject parcel, the sensor will be removed or redeployed upon 30 days written notice that a grading permit has been issued by the County of San Diego permitting development of all or

[12] Furthermore, Rancho did not establish that mere overflight by a drone interferes with Rancho's property rights and thus constitutes a "taking" for Fifth Amendment purposes. (Tr. Court, 208:23–24 ("[S]omebody explain to me [how] mere drone operation, even if it's overflying plaintiffs' property in route to somewhere else to look at presumably migrant activity . . . can be possibly subject to a takings claim, please.")). Neither party directed the Court to any controlling or persuasive authority.

> a portion of the property. Upon removal of a sensor, the portion of the easement relating to that sensor shall terminate....

*Otay Mesa I*, 86 Fed. Cl. at 777 (quoting Def.'s Stip. at ¶ 7). In this latest iteration of Rancho's longstanding dispute with Border Patrol, the United States unequivocally represented that all the [redacted] ECF No. 138); *see also Int'l Paper Co. v. United States*, 39 Fed. Cl. 478, 482 (1997) ("[D]efendant's oral statements on the record in open court . . . constitute judicial admissions.") (internal citations omitted). Accordingly, [redacted], and any subsequent installation of sensors would give rise to a new physical invasion.

Border Patrol learned nothing from that experience. Once again, from 2021 to 2025, Border Patrol, without permission from Rancho, installed new sensors at various unknown locations on Rancho's property. (Tr. Woods, 267:18–268:3). Even absent a stipulation as to liability, the facts before the Court are sufficient to establish that the sensors, standing alone, effected a taking. *Hendler v. United States*, 952 F.2d 1364, 1377 (Fed. Cir. 1991) (holding circumstances were sufficient to find a taking where the government repeatedly entered private property at its convenience to install, service, and obtain information from wells that remained on the property, thereby appropriating the owner's right to exclude for as long as the wells remained). To the extent Rancho sought compensation for the installation and operation of those sensors, the Federal Circuit has already recognized that such conduct could give rise to a permanent physical taking. *Otay Mesa 1*, 86 Fed. Cl. at 777; *Otay Mesa Property, L.P. v. United States*, 779 F.3d 1315, 1319 (Fed. Cir. 2015) ("[W]e held that the Border Patrol's blanket easement to install, maintain, and service sensors on Otay Mesa's property constituted a permanent physical taking."); *see also Hendler*, 952 F.2d at 1377. Because there is no dispute that Border Patrol repeatedly entered Rancho's property to install, service, and retrieve sensors that remained on the property for a period of time, the Court finds that a taking occurred.

*C. Rancho failed to establish just compensation.*

Consistent with the Court's findings above, the only valuation at issue concerns Border Patrol's installation and operation of the sensors. The evidence presented, however, is insufficient to permit the Court to determine just compensation. *Laviolette v. United States*, No. 2025-1244, ___ F.4th ___, 2026 WL 1875109, at *5 (Fed. Cir. June 30, 2026) ("If the landowner fails to meet that burden, the court may award no compensation.") (citing *Gasden Industrial Park, LLC v. United States*, 956 F.3d 1362, 1370, 1373–74 (Fed. Cir. 2020)). To carry its burden, Rancho was tasked with "proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed. Cir. 1987) (citation omitted). It failed to do so.

For reasons that remain unclear, Rancho elected not to pursue a permanent physical takings theory. That strategic choice necessarily shaped Rancho's presentation of its just compensation case. Although the Court concludes that the record is sufficient to establish a

permanent physical taking based on the installation and operation of the sensors, Rancho did not litigate or prove damages on that theory. The Court cannot disregard the theory on which Rancho tried its case or construct an alternative measure of compensation on its behalf.

Rancho expressly acknowledges that its claim is for a temporary taking arising from the gap in the border wall, notwithstanding the Federal Circuit's prior conclusion that the installation and operation of the sensors constitutes a permanent physical taking. (Tr. Pls.' Counsel, 13:1–7 ("[T]his case is about the federal government's . . . use and occupation of plaintiffs' property . . . amounting to a temporary taking[.]"), 17:11–14, 408:23–409:17). Just compensation in a temporary taking is typically the fair rental value of the property for the period of the taking. *Otay Mesa Property L.P.*, 670 F.3d at 1364. Fair rental value is the rent that likely would have been obtained through a hypothetical negotiation between the property owner and a lessee for the temporary interest appropriated by the government. *Kimball Laundry Co. v. United States*, 338 U.S. 1, 7 (1949).

Rancho's valuation evidence was minimal. The only proffered evidence came from Rancho's party representative, Mr. David Wick. Ostensibly, his valuation opinion was based on his experience negotiating "hundreds and hundreds" of leases in the region. (Tr. D. Wick, 301:7–15). The two specific leases offered, however, were those negotiated with Border Patrol's wall contractor. More specifically, those two leases involved a three-acre portion of the Property at approximately $4,167 per acre per month, (*id.*, 315:24–317:2; JX 12), and a 5.5-acre portion at approximately $5,400 per acre per month, (*id.*, 313:12–314:8). Based on these figures, Mr. David Wick opined that the fair rental value was $3,267 per acre, per month. (Tr., 327:20–328:2). He then applied the $3,267-per-acre monthly rental rate to the entire 791.11 acres over a 55-month period, corresponding to the duration of the alleged temporary taking, and arrived at a total damages figure exceeding $130 million. (Tr. D. Wick, 328:18–329:1, 360:17–23).

The Court is not persuaded by this valuation method. Rancho did not tender Mr. David Wick as an expert and conceded that his opinion rests entirely on his personal experience negotiating leases. (*See* Tr. Pls.' Counsel, 321:3–10). While Mr. David Wick referenced "thousands" of leases he purportedly negotiated, none were admitted into evidence, leaving the Court unable to evaluate their comparability to Rancho's property. (Tr. D. Wick, 301:20, 311:23, 320:13–18). The Court finds that the two agreements referenced by Mr. David Wick were contracts with a government contractor for construction of the border wall; these are not reliable indicators of fair rental value as would be understood in a market transaction between willing participants.

Nevertheless, the Court has theorized on a methodology to calculate just compensation for Border Patrol's use of Rancho's land for sensor placement. *See Vaizburd v. United States*, 384 F.3d 1278, 1285–87 (Fed. Cir. 2004) (traditional compensation methods are not exclusive). The Court has considered whether Rancho's request for more than $130 million in just compensation might supply some measure of damages. But that figure is unavailing for at least two reasons. First, it is based on Rancho's temporary taking theory which relies on a fair rental value methodology. Second, it appears to derive, at least in part, from an approximation of the compensation initially awarded, but ultimately rejected, in *Otay Mesa*. 670 F.3d at 1367–69 (rejecting damages analysis in *Otay Mesa Property, L.P. v. United States*, 93 Fed. Cl. 476, 487–90 (2010)). Neither approach finds support in the trial record. Indeed, Rancho's damages theory

is predicated on the totality of Border Patrol's activities on the property—including foot patrols, vehicle traffic, horseback patrols, drone overflights, and sensors. Yet, of all of the activities comprising Rancho's Fifth Amendment claim, surreptitious sensors are the least obtrusive and pose the least interference with Rancho's rights. Additionally, Rancho failed to address any evidence at trial relating to the method or manner of installation.

Moreover, despite testifying that Border Patrol activity was concentrated in roughly thirty percent of the property nearest the gap, Mr. David Wick's application of his rental-rate estimate to the entire 791.11-acre property for the full 55-month period is implausible. (Tr. D. Wick, 364:13–365:4, 365:9–13 (The Court: "[So] as long as there is some Border [P]atrol activity on the property . . . you're entitled to just compensation for the temporary take of the entire property?" Mr. David Wick: "That is our -- what we're pleading."), 370:6–14). Even if the Court found this method credible, Mr. David Wick offered no evidentiary basis to support his assertions that Border Patrol's activity was concentrated on 30-percent of the property or his application of that estimate to the entirety of the property.[13] Absent a credible evidentiary basis for determining just compensation, Rancho failed to meet its burden of proving damages.[14] The surprising failure to offer persuasive evidence regarding just compensation affects the entirety of Rancho's claim.

The Federal Circuit is clear; a determination of just compensation must focus on exactly what has been taken. *Otay Mesa Property, L.P.*, 779 F.3d at 1320. Even had Rancho advanced a

---

[13] During a site visit, the Court observed that Border Patrol activity appeared to be concentrated in a relatively small area near the location of the former 700-foot gap. The visit was largely guided by the parties, and Plaintiffs did not direct the Court to other portions of the property for inspection. Moreover, the areas viewed during the visit appeared to comprise only a small fraction of the Subject Property's 791.11 acres.

[14] At trial, Mr. David Wick testified that Border Patrol's presence on the Property prevented Rancho from marketing the Property for mitigation banking. (Tr. D. Wick, 307:16–308:13). Mitigation banking is a process through which the environmental impacts of development are offset by restoring, creating, enhancing, or preserving wetlands, habitat, or other natural resources at an approved mitigation site. Despite this contention, Mr. Wick acknowledged that no regulatory agency had informed Rancho that the Property was ineligible for mitigation banking because of Border Patrol's presence. (*Id.*, 342:24–343:3). Likewise, although Rancho's mitigation banking expert, Mr. Vincent Scheidt ("Mr. Scheidt"), opined that the costs associated with establishing a mitigation bank could render the endeavor economically infeasible, (Tr. Scheidt, 112:5–9), he also acknowledged that portions of the Property remained "highly suitable" for mitigation banking. (Tr. Scheidt, 81:20-22 (stating "[P]ortions of the property . . . contain some of the rarest plants and animals in Southern California[.]")). Notably, Mr. Scheidt did not prepare a cost estimate to support his opinion regarding economic infeasibility. (*Id.*, 112:5–21). Finally, Mr. Wick testified that Rancho has made no effort since 2021 to pursue approval of the Property as a mitigation bank. (Tr. D. Wick, 343:22–344:2). Taken together, the evidence does not establish that the Property was unsuitable for mitigation banking or that Border Patrol's activities foreclosed Rancho from pursuing such use.

permanent takings theory based on the presence of new sensors, it offered no evidence whatsoever regarding the recompense for Border Patrol's unapproved sensor usage. Rancho's hypothetical $130 million figure is also in no sense "just." In *Otay Mesa*, the Circuit characterized Border Patrol's placement of sensors as "a minimally invasive permanent easement to use undeveloped land" and recognized that under the easement "each sensor must be located so as not to affect the functionality of the property." *Otay Mesa, L.P.*, 670 F.3d at 1368. As to compensation for those sensors, the Circuit's findings foreclosed the idea that commercial leases alone might provide appropriate evidence of just compensation due. *Id.* at 1368–69. The sensors at issue in the present litigation are not distinguishable and Rancho's failure of proof is baffling, given the unequivocal outcome in *Otay Mesa*.

*Otay Mesa* provides little guidance regarding the appropriate measure of compensation. In the original proceedings, the trial court awarded approximately $3 million for fourteen sensors based upon the parties' stipulation that a taking had occurred and a valuation methodology that relied on the property's rental value. *Otay Mesa, L.P.*, 670 F.3d at 1368. The Federal Circuit vacated that award, holding that the trial court had employed an improper measure of damages. *See id.* Certainly, Rancho does not contend that the vacated award in *Otay Mesa* provides an appropriate measure of compensation here. On remand, the trial court concluded that the sensor easement created a risk that the property would be rejected for mitigation banking, thereby diminishing its fair market value. *Otay Mesa Property, L.P. v. United States*, 110 Fed. Cl. 732, 747 (2013). In reaching that conclusion, the trial court found that the easement created a risk that the property could be rejected for mitigation banking purposes and ultimately awarded $455,520, representing approximately five percent of the property's fair market value. *Id.*

The evidentiary record here, however, does not permit a similar valuation analysis. Unlike in *Otay Mesa*, there has been no stipulation regarding liability, and Rancho introduced no evidence concerning the Property's fair market value, electing instead to rely exclusively on testimony regarding fair rental value—a measure the Federal Circuit expressly rejected in *Otay Mesa*. 779 F.3d at 1325. The only evidence of fair market value came from the United States' appraiser, Mr. Stephen Roach ("Mr. Roach"), who opined that the Property's fair market value remained unchanged at $39,560,000 in both the "before" and "after" conditions. (Tr. Roach, Tr. 719:17–21, 721:8–722:14, 734:17–736:8). Mr. Roach testified that the Property's highest and best use, considered as a whole, was mitigation. (*Id.*, 699:25–700:4). He valued the Property in its "before" condition using nine comparable sales of mitigation properties and concluded that it was worth $50,000 per acre, resulting in a "before" value of $39,560,000. (*Id.*, 703:7–18, 719:17–21). Plaintiffs' rebuttal appraiser, Mr. Lance Doré ("Mr. Doré"), agreed that Mr. Roach's "before" valuation was accurate. (Tr. Doré, 833:7–16).

Even if the Court were to rely on Mr. Roach's appraisal as evidence of the Property's fair market value, the record remains insufficient to determine just compensation. Mr. Roach valued the Property as a whole, whereas Mr. David Wick testified that Border Patrol's activities were concentrated on only approximately thirty percent of the Property. (Tr. D. Wick, 370:6–14). As previously explained, awarding compensation based on the value of the entire Property would not comport with the principles of just compensation because it would bear no relationship to the limited property interest taken. Moreover, unlike the plaintiffs in *Otay Mesa*, Rancho presented no evidence allocating the Property among its potential highest and best uses or identifying which portions of the Property were suitable for mitigation and the acreage that could be devoted

to that use. *See* 110 Fed. Cl. at 738 (finding plaintiffs appraiser determined each parcel's highest and best use by evaluating physical and legal characteristics and concluded that 619 acres were best suited for mitigation and 278 acres for industrial development). Without evidence identifying the affected acreage and its corresponding value, Rancho failed to prove the amount of just compensation, leaving the Court without a basis to determine an appropriate damages award.

## IV. Decision and Order of Judgment

Based on the foregoing, the United States is liable for a taking, specifically through the placement of sensors on Rancho's property. However, Rancho has failed to carry its burden of proof as to just compensation. Pursuant to RCFC 58, the Clerk is **DIRECTED** to enter final judgment in favor of the United States. The parties shall meet and confer and file a Joint Status Report proposing redactions to this Memorandum Opinion within **fourteen (14) days** of its entry to allow the Court to file a public version of the Opinion.

**IT IS SO ORDERED.**

s/ David A. Tapp
DAVID A. TAPP, Judge